# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## NO. 2022 CU 1113

## AMBER LEGER

### VERSUS

## KYLE BRANDON LEGER

*Judgment Rendered:* **MAR 1 3 2023**

* * * * * * * *

Appealed from the
21st Judicial District Court
In and for the Parish of Livingston
State of Louisiana
Case No. 122271, Division J

The Honorable Jeffrey C. Cashe, Judge Presiding

* * * * * * * *

C. Glenn Westmoreland
Meghan Harwell Bitoun
Albany, Louisiana

Sherman Q. Mack
Albany, Louisiana

Emily Guidry Jones
Ponchatoula, Louisiana

Counsel for Defendant/Appellant
Kyle Brandon Leger

Mark D. Plaisance
Marcus J. Plaisance
Prairieville, Louisiana

DeVonna Ponthieu
Livingston, Louisiana

Counsel for Plaintiff/Appellee
Amber Leger

* * * * * * * *

BEFORE: THERIOT, CHUTZ, AND HESTER, JJ.

Hester J., dissents with reasons
Chutz, J., concurs

**THERIOT, J.**

In this custody proceeding, the father appeals a judgment ruling on his motion to modify custody. For the reasons set forth herein, we affirm.

## FACTS AND PROCEDURAL HISTORY

Kyle Leger and Amber Leger[1] were married on May 28, 2005. They had one child, L.L.,[2] who was born in 2007. The parties separated in 2007 before L.L. was born and were divorced on September 28, 2009. Kyle and Amber were granted joint custody of L.L. by a stipulated judgment dated March 30, 2010, with an equal sharing of physical custody on an alternating weekly basis.

On November 15, 2010, Amber filed a motion to modify shared custody to domiciliary custody, alleging that Kyle was not exercising physical custody of L.L. as set forth in the stipulated judgment. Another stipulated judgment was issued on January 25, 2011, in which the parties agreed to joint custody of L.L., with Amber designated as the domiciliary parent and Kyle having physical custody of L.L. every other weekend once he had "a place with a bathroom and a separate bed for the minor child."[3]

On May 18, 2021, Kyle filed a pro se Rule to Establish Custody with Request for Emergency Custody by Parent, in which he sought sole custody of L.L., subject to visitation with Amber "every other weekend at [L.L.'s] decision." Kyle's supporting affidavit filed pursuant to La. C.C.P. art. 3945(B)[4] stated that:

> Immediate and irreparable injury will result to [L.L.] . . . before [Amber or her attorney] can be heard in opposition because of the following SPECIFIC FACTS:

---

[1] Amber has remarried and now goes by Amber Butcher.

[2] The initials of the minor child will be used in this opinion in order to protect her privacy.

[3] The judgment further provided that Kyle would have physical custody "every other weekend from Saturday at 9 am until 6 pm and Sunday from 9 am until 6 pm" until he satisfied the housing requirement.

[4] Louisiana Code of Civil Procedure article 3945(B) provides, in part, that an ex parte order of temporary custody shall not be granted unless it clearly appears from specific facts shown by a verified petition or by supporting affidavit that immediate and irreparable injury will result to the child before the adverse party or his attorney can be heard in opposition.

[L.L.] has said that her mother's household is toxic. Always yelling and screaming at her. She said she is scared that her mother will one day hit her.

She told her mother that she wanted to live with me. Her mother and stepdad responded by yelling, screaming[,] and cursing at her. [L.L.] called me to come get her.

On my arrival, [L.L.] was [literally] shoved out the front door. I quickly got [L.L.] in the car as her mother and stepfather yelled [and] cursed both of us.

[L.L.] says she does not want to go back.

The trial court granted Kyle's request for emergency ex parte custody of L.L. on May 18, 2021, with Amber having supervised visitation every Saturday from noon until four p.m., pending a hearing on custody to be held on May 26, 2021. After the hearing, which was conducted via zoom, the trial court denied Kyle's request, finding that the situation did not rise to the level of emergency custody, and ordered that the most recent custody judgment prior to Kyle's application for temporary custody would remain in effect as the controlling custody judgment. Kyle filed a motion for new trial, alleging that he had retained an attorney since the hearing and had additional evidence to support his claim that was not presented at the hearing due to his pro se status.[5]

On June 4, 2021, Amber filed a motion for sanctions, contempt, and a civil warrant, alleging that Kyle failed to return L.L. to her after the trial court denied his request for temporary custody, despite repeated requests for her return. Amber asked that the court issue a civil warrant for L.L.'s return and that Kyle be held in contempt for his willful disobedience of the trial court's judgment. Amber also sought sanctions on the grounds that Kyle's ex parte rule for custody was frivolous, misrepresented the facts, falsely alleged abuse, and failed to properly inform the court of the background and circumstances involved in this case, and

---

[5] Kyle's motion for new trial was set for hearing on September 1, 2021; however, the court was closed on that date due to weather conditions associated with Hurricane Ida, and there is nothing in the record to indicate that his motion was ever ruled on by the trial court.

3

consequently caused her to incur legal fees and costs. On July 6, 2021, the trial court issued the civil warrant as requested, and L.L. was returned to Amber's home.[6]

On July 14, 2021, Kyle filed a motion for modification of custody with a request for emergency ex parte relief, asserting that a significant change in circumstances had occurred and substantial harm to L.L. would result if custody was not modified. Kyle again sought immediate temporary custody of L.L. pending a hearing on his motion. In his motion, Kyle alleged that since L.L.'s return to Amber's home, she had begun to have suicidal thoughts and engage in self-harming behavior for which she was taken to the emergency room on July 9, 2021. He further alleged that on July 12, 2021, L.L. sent him text messages from her stepfather's phone stating that she was scared and asking him to call the police, and although he attempted to contact Amber about L.L., she refused to respond.[7] The trial court granted temporary custody of L.L. to Kyle, pending a hearing on his motion for modification of custody, with Amber having unsupervised visitation on alternating weekends. The trial court issued another civil warrant, and two deputies removed L.L. from Amber's house on July 14, 2021 and placed her in Kyle's custody. Before leaving Amber's house with Kyle, L.L. handed the deputies a small plastic bag containing "a miniscule amount of leafy green material," stating "this is my mom[']s weed." Although the police report from that date notes that the bag and its contents were logged and put into evidence, no charges were filed due to it being "such a miniscule amount" and "not being able to prove possession."

---

[6] The remaining issues in Amber's motion were set for hearing on September 1, 2021; however, the court was closed on that date due to weather conditions associated with Hurricane Ida, and it is not clear whether these issues were ever ruled on.

[7] The records from L.L.'s July 9, 2021 hospitalization and copies of the text messages were filed with Kyle's motion.

4

Although Kyle's motion to modify custody was originally set for hearing on July 21, 2021, it was continued several times. A hearing on the matter was eventually held on October 15, 2021; however, the parties were unable to finish their presentation of the evidence on that day, and the hearing resumed on May 12, 2022. During this time, L.L. continued to live with Kyle and his wife, Amy, and she was enrolled in a new school near Kyle's home.

During a visit with Amber on December 27, 2021, L.L. contacted Amy and told her that she was scared of Amber and had cut herself. Kyle called the sheriff's office to request a welfare check, and a deputy went to Amber's house to investigate. L.L. told the deputy that she was afraid of Amber and wanted to live with her father permanently. She denied being physically abused by Amber, but told the deputy that she is afraid of Amber because she yells at her. She said that she and Amber had been arguing during dinner the night before because L.L. had broken a rule, and Amber had stood up abruptly, making L.L. think that Amber was about to hit her. After speaking to L.L. and photographing the "small scratch" that L.L. told him was self-inflicted, the deputy concluded that L.L. was not in need of immediate medical attention, nor was she suicidal or homicidal. The deputy also spoke with Amber, who informed him that L.L. had done "the exact same thing several months ago when she took her cellphone away from her." The deputy noted in his report that after reviewing the report from the July 9, 2021 welfare check that resulted in L.L. being taken to the hospital, he believed that L.L. was attempting to harm herself in order to influence the outcome of the custody dispute. Shortly after this incident, L.L. began seeing a counselor, and she was still treating with him at the time of the May 12, 2022 hearing.

L.L., who was fourteen years old at the time the trial began, testified at a *Watermeier*[8] hearing, the transcript of which was sealed. According to L.L.'s testimony, she currently lives with Kyle and Amy and attends school near their home. L.L. expressed a preference to live with Kyle and continue attending school there. L.L. testified at length about the deterioration of her relationship with Amber and Amber's reluctance to recognize and seek help for L.L.'s mental health and academic struggles. She also testified about her relationship with Kyle and the positive changes in all aspects of her life since she had been living with him.

Kyle testified that when L.L. was younger, he did not always exercise physical custody as provided in the parties' stipulated judgment. He explained that his work schedule sometimes prevented him from picking up L.L. at the designated time, and he was not always able to reach an agreement with Amber to pick her up at a different time, causing him to miss his physical custody periods entirely. Later, Kyle remarried, and L.L. "didn't really want to come around a whole lot," so he would pick her up and take her to lunch to spend time with her, but he did not force her to stay overnight at his house. Kyle testified that even though L.L. did not come to his house as often as the stipulated judgment provided for, she still went on vacations with him and his second wife and traveled with them for the holidays. Around the summer of 2020, when Kyle divorced his second wife, L.L. started coming to stay at his house more often and spending more time with him. Kyle married Amy, his third wife, shortly after his divorce from his second wife. He testified that L.L. gets along well with Amy and enjoys spending time at his house with them.

Kyle testified that while he was driving L.L. back to Amber's house after a weekend visit in May of 2021, L.L. asked him if she could live with him. When

---

[8] See *Watermeier v. Watermeier*, 462 So.2d 1272 (La.App. 5 Cir.), *writ denied*, 464 So.2d 301 (La. 1985). A *Watermeier* hearing is a hearing in chambers, outside the presence of the parents, but in the presence of their attorneys, with a record of the hearing to be made by the court reporter, to inquire as to the competency of a child to testify as to custody. *In re D.C.M.*, 2013-0085, n.9 (La.App. 1 Cir. 6/11/13), 170 So. 3d 165, 168, n.9, *writ denied*, 2013-1669 (La. 7/17/13), 118 So.3d 1102.

6

they arrived at Amber's house, he told Amber about L.L.'s request. Initially, Amber stormed off, but when she returned, she told him that L.L. would not be going anywhere with him and that she would see him in court. Kyle left, but shortly afterwards he got a phone call from L.L., who was crying. Kyle testified that he could hear yelling and screaming in the background, and L.L. asked him to please come get her because she was scared. Kyle drove back to Amber's house, and L.L. came outside to meet him. Kyle testified that when L.L. walked out the front door holding her belongings, it appeared that Amber's husband, John, pushed her from behind. He testified that John was "cussing" at him and Amber was "hollering and screaming" that he was "nothing but a sperm donor." After L.L. got into Kyle's car, Amber sent L.L. a text message saying "Good luck with your new family." Following this incident, Kyle obtained emergency ex parte custody of L.L., and she stayed with him until July, when Amber obtained a civil warrant for her return.

Kyle testified that shortly after her return to Amber's house, L.L. was taken to the emergency room on July 9, 2021 for self-harming behavior. On that day, Kyle called the sheriff's office and requested a wellness check after L.L. called him crying and asking him to come get her because she was scared. He later received a call from a deputy telling him that L.L. had been taken to a hospital for evaluation because she informed the deputy that she had been cutting herself. Kyle went to the hospital and, after speaking to the doctors, agreed to allow L.L. to be discharged to Amber's home. Kyle acknowledged that L.L.'s cuts were not deep at all and were more like scratches and testified that he believed the cuts were a "cry for help." After receiving concerning text messages from L.L. a few days after her return to Amber's house, Kyle filed a motion to modify custody and for temporary ex parte custody. His request for temporary custody was granted, and L.L. has been living primarily with him since that time.

7

Kyle testified that L.L. is happy living with him and has made a great group of friends at her new school and is showing interest in trying new extracurricular activities. He testified that she is doing better in school since he had her evaluated by a doctor and she started taking prescribed medication for ADHD. Kyle said that L.L. has been seeing a counselor at school weekly since January 13, 2022, and feels like she is making progress with the counselor, and he intends to continue her in counseling. He testified that L.L. is often nervous and seems depressed when it is time to go to Amber's house for a weekend. He explained that L.L. "wants a better relationship with her mother, but it worries her whenever she has to go on the weekends." Kyle testified that when L.L. lived with Amber, Amber did not keep him informed about a number of important matters involving L.L. He also testified that Amber frequently takes away L.L.'s phone as a punishment, which prevents her from contacting Kyle while she is with Amber. Kyle admitted that since L.L. has been with him, he has made several medical decisions for her without discussing them with Amber first, such as taking her for an ADHD evaluation or a vaccination or giving her over-the-counter melatonin gummies to help her sleep at night, but he testified that both the ADHD medication and the vaccination were recommended by her doctor. Although he and Amber have had trouble communicating and agreeing on custody matters, Kyle testified that he is making an effort now to keep Amber informed of everything going on with L.L., and has tried to include her in things, such as having Amber over to his house to take pictures of L.L. before school dances.

Amber testified that L.L. lived primarily with her for the first thirteen years of her life, and Kyle did not see her a lot during that time. She testified that the allegations made by L.L. and Kyle that her house is not a stable and healthy environment are untrue and she believes that L.L. is manipulating the system. She believes that L.L. wants to live with Kyle because he does not have strict rules and

8

she has more freedom at his house. She denied that she and John are always fighting and yelling and that she forced L.L. to participate in sports at the expense of her grades. In fact, she testified that she cut L.L. from a team she coached when L.L.'s grades dropped. Amber also denied that the bag of "weed" that L.L. gave to the deputy belonged to her and denied that she or John smokes marijuana. Amber testified that she frequently takes L.L.'s phone away as a punishment for breaking rules, lying to her, lying about her to "official people," and being defiant, but L.L. still manages to obtain phones from other people to use.

Amber testified that when Kyle cannot get in touch with L.L. because she is not allowed access to the phone, he calls law enforcement for a welfare check. On one such occasion, Amber and L.L. had been arguing because Amber took away some of L.L.'s clothes that had been purchased for her by Amy. Amber explained that she thought the clothes were inappropriate, and she did not want L.L. to be able to wear them when she was at Kyle's house. Amber testified that she had taken L.L.'s phone away, so L.L. used her younger brother's phone to contact Kyle. Kyle called the sheriff's office and requested a welfare check, and the deputy insisted on sending L.L. to the hospital by ambulance after L.L. disclosed to him that she had been cutting herself. Amber initially testified that this incident on July 9, 2021 was the first time she heard of any self-harming behavior. However, on cross-examination she admitted that L.L.'s school had notified her about such behavior in 2018 and asked her to take L.L. to a counselor.[9] Amber testified that she brought L.L. to a counselor in 2018 as recommended by the school, but when the counselor became ill and could no longer see L.L., she did not look for another counselor. Amber also brought L.L. to see a counselor once after the July 9, 2021 hospitalization; however, after that visit Kyle obtained an order of temporary

---

[9] Although the October 18, 2018 "Parent/Guardian Emergency Conference Notice" that Amber signed clearly states "I have been informed that my child has been expressing suicidal thoughts," and "I have been advised that I should immediately take my child to a hospital to be evaluated," Amber insisted that no one ever told her that L.L. had threatened suicide.

custody and had L.L. removed from her home before she could return to the counselor.

Amber testified that since L.L. has been living with Kyle, he has not kept her informed about what is going on with L.L., such as the fact that she was seeing a counselor at school or that he was taking her to a doctor. She testified that she informed Kyle in 2018 when L.L. went to a counselor, but she could not recall how she communicated that information to him and admitted that she listed her husband John as the "parent" to contact in case of emergency on the counseling intake form. Amber testified that she would communicate with Kyle if L.L. came back to live at her house and would make sure L.L. continues to get counseling. Amber testified that she gets along well with Kyle's wife Amy, and they could do things together as a family.

Amy, Kyle's wife, testified that she has a good relationship with L.L. and enjoys spending time with her. Amy helps to monitor L.L.'s schoolwork and grades, and she testified that L.L. has recently started going to math tutoring. Amy explained that she is not trying to replace L.L.'s mother, and she has encouraged L.L. on a number of occasions to open up to Amber. Amy has attempted to build a relationship with Amber as well, and they recently took L.L. shopping for a homecoming dress together. Amy testified that L.L. gets nervous when it is time to go to Amber's house for a weekend, but that is improving over time. According to Amy, L.L. is starting to build a relationship with Amber and is happy when she returns from a visit and says that they had a good time.

Amber's husband, John, testified that he has been married to Amber for eight years and has been around L.L. "100 percent of the time" since she was about a year and a half old. He testified that he has been like a father to L.L., although he did not usually help with homework or go to sporting events because he is tired after work and has things to do around the house. John testified that he used to get

10

along well with Kyle, but he does not really know Amy at all. John denied the allegations that he shoved L.L. as she walked out the door on the day she left to live with Kyle.

Sandy Boulion, Amber's mother, testified that she believes that L.L. wants to live with Kyle because he does not have any rules and L.L. thinks Amber has too many rules. She testified that L.L. and Amber's relationship has changed in the last year and a half, and they disagree frequently because L.L. "get[s] very upset when her mother tells her no; it doesn't matter what the subject is, but there's going to be a little fit to be thrown." Sandy testified that L.L. has recently become distant from her as well.

A report from Justin Laborde, LCSW, was filed in evidence. Laborde has been L.L.'s "primary mental health therapist" since January 13, 2022. L.L. was originally referred to therapy for "excessive worry, history of unstable family relationships, and history of self-injurious behaviors" and has been diagnosed with Generalized Anxiety Disorder. Laborde noted that L.L. identified her primary stressors as peer and family relationships and academic achievement. Over the course of several months of counseling sessions, L.L. has reported an overall decrease in anxiety symptoms and increased feelings of stability, which she attributes to reduced levels of conflict in her current placement compared to her previous placement, an improved social network (particularly at school), and access to medication and counseling services. Without giving an opinion regarding custody or domiciliary arrangements, Laborde reported the following regarding his therapy sessions with L.L.:

> [L.L.] has spent significant amounts of time during therapy processing her relationship with her mother. [L.L.] reported significant levels of conflict with her mother at the beginning of therapy. According to [L.L.], her tumultuous relationship with her mother was a primary factor in moving in with her father. Since the beginning of therapy, [L.L.] has noted an improvement in the relationship with her mother. Initially, [L.L.] noted moderate to

11

severe anxiety when forced to interact with her mother. While the anxiety has declined in severity, [L.L.] continues to denote symptoms in anticipation of interaction with her mother. [L.L.] remains committed to the treatment goal of a better relationship with her mother. However, [L.L.] has also acknowledged that she would like to see continued improvement in relationship before she would feel comfortable being with her mother for more than a few days at a time.

At the close of evidence, the trial court noted that although it was clear that L.L. wanted to live with Kyle, the reasonable preference of the child is only one factor to be considered when determining the best interest of the child. The trial court declined to change the domiciliary parent named in the 2011 consent judgment, but changed the physical custody allocation to give Kyle additional periods of physical custody. The trial court issued a judgment[10] ordering that the parties will have joint custody of L.L., with Amber designated as the domiciliary parent. The judgment provided that Kyle will have physical custody of L.L. three weekends a month during the school year, with weekends starting Thursday afternoons when he picks L.L. up from school and ending Monday morning when he drops L.L. off at school.[11] During the summer, the parties will alternate physical custody on a weekly basis. The judgment also provides for telephone visitation for each parent when the child is with the other parent, as well as a holiday physical custody schedule, and an order that L.L. is to be given medication as prescribed and attend counseling. This appeal followed.

## DISCUSSION

In his sole assignment of error on appeal, Kyle argues that the trial court erred in failing to name him as domiciliary parent when the overwhelming evidence adduced at trial demonstrated that it would be in L.L.'s best interest to live with him.

---

[10] The court issued an amended judgment on July 6, 2022 in order to correct a typographical error in the original judgment signed by the court.

[11] The judgment further provides that if Kyle is unable to pick up or drop off L.L. at school, then his weekends will be shortened.

Each child custody case must be viewed in light of its own particular set of facts and circumstances, with the paramount consideration being the best interest of the child. See La. C.C. art. 131; *Moore v. Prater*, 2021-1430, p. 4 (La.App. 1 Cir. 6/3/22), 342 So.3d 994, 998. The best interest of the child standard governs all child custody determinations, including the determination of whether to modify the domiciliary parent designation. *Council v. Livingston*, 2019-1049, p. 9 (La.App. 4 Cir. 3/13/20), --- So.3d ---, ---, *writ denied*, 2020-00753 (La. 7/10/20), 298 So.3d 178. The trial court is in the best position to ascertain the best interest of the child given the unique circumstances of the particular case; thus, the trial court's custody determination is entitled to great weight and will not be disturbed on appeal unless an abuse of discretion is clearly shown. *Tumminello v. Clark*, 2022-0929, p. 6 (La.App. 1 Cir. 12/29/22), --- So.3d ---, ---.

Louisiana Civil Code article 134(A) provides the following non-exclusive list of factors that the trial court shall consider, along with any other relevant factors, in determining the best interest of the child:

(1) The potential for the child to be abused, as defined by Children's Code Article 603,[12] which shall be the primary consideration.

(2) The love, affection, and other emotional ties between each party and the child.

(3) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

---

[12] Louisiana Children's Code article 603 defines "abuse" as:

[A]ny one of the following acts that seriously endanger the physical, mental, or emotional health, welfare, and safety of the child:

(a) The infliction, attempted infliction, or, as a result of inadequate supervision, the allowance of the infliction or attempted infliction of physical or mental injury upon the child by a parent or any other person.

(b) The exploitation or overwork of a child by a parent or any other person, including but not limited to commercial sexual exploitation of the child.

(c) The involvement of the child in any sexual act with a parent or any other person, or the aiding or toleration by the parent, caretaker, or any other person of the child's involvement in any of the following:
(i) Any sexual act with any other person.
(ii) Pornographic displays.
(iii) Any sexual activity constituting a crime under the laws of this state.

(d) A coerced abortion conducted upon a child.

(e) Female genital mutilation as defined by R.S. 14:43.4 of the child or of a sister of the child.

13

(4) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(5) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(6) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(7) The moral fitness of each party, insofar as it affects the welfare of the child.

(8) The history of substance abuse, violence, or criminal activity of any party.

(9) The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody.

(10) The home, school, and community history of the child.

(11) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party.

(13) The distance between the respective residences of the parties.

(14) The responsibility for the care and rearing of the child previously exercised by each party.

The weight to be given each factor is left to the discretion of the trial court. *Moore*, 2021-1430 at p. 7, 342 So.3d at 1000. In making its determination, the trial court is not bound to make a mechanical evaluation of all of the statutory factors listed in Article 134, nor is the trial court required to specifically explain its weighing and balancing of the Article 134 factors. Rather, the trial court should decide each case on its own facts and circumstances in light of Article 134 and all other relevant factors. *Tumminello*, 2022-0929 at p. 8, --- So.3d at ---.

Additionally, in most child custody cases, the trial court's determination is based heavily on factual findings. *Yepez v. Yepez*, 2021-0477, p. 8 (La.App. 1 Cir. 12/22/21), 340 So.3d 36, 41-42. It is well-settled that an appellate court cannot set aside the trial court's findings of fact in the absence of manifest error or unless

14

those findings are clearly wrong. See *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989). When presented with two permissible views of the evidence, the trial court's choice between them cannot be manifestly erroneous or clearly wrong. *Stobart v. State through Department of Transportation and Development*, 617 So.2d 880, 883 (La. 1993). Furthermore, it is well-settled that where there is a conflict in testimony, the trial court's reasonable evaluations of credibility and reasonable inferences of fact are not to be disturbed by a reviewing court. *Moore*, 2021-1430 at p. 9, 342 So.3d at 1001. If documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible that a reasonable fact finder would not credit it, the reviewing court may find manifest error or clear wrongness, even in a finding purportedly based upon a credibility determination. But in the absence of such factors, where the finding is based on the trial court's decision to credit the testimony of one party over the other, the finding can virtually never be manifestly erroneous or clearly wrong. *Rosell*, 549 So.2d at 844-45. One court has observed:

> In child custody cases where two parents are fervently competing for custody and domiciliary status of the children, frequently the trial court must determine the best interest of the children solely from the testimony of the parents and their respective relatives or friends. This naturally passionate and self-interested testimony is rarely objective, leaving it to the trial court, who is in the best position to view firsthand the demeanor and tone of the witnesses, to assess the credibility of the witnesses, and decide how much weight to give the testimony in light of the factors in La. C.C. art. 134.

*Fuller v. Fuller*, 54,098, pp. 24-25 (La.App. 2 Cir. 7/21/21), 324 So.3d 1103, 1114, *writ denied*, 2021-01223 (La. 9/27/21), 324 So.3d 621.

In cases where the underlying custody decree is a stipulated judgment and the parties have consented to a custodial arrangement with no evidence as to parental fitness, a party seeking a modification of that judgment must prove that: (1) there has been a change in circumstances materially affecting the welfare of the child since the original (or previous) custody decree was entered; and (2) the

proposed modification is in the best interest of the child. *Yepez*, 2021-0477 at p. 8, 340 So.3d at 42. Accordingly, a party seeking modification of the domiciliary parent designated in a stipulated judgment must meet the two-prong test of proving that there has been a change in circumstances materially affecting the welfare of the child since the consent judgment, as well as proving that the proposed modification is in the best interest of the child. *Tinsley v. Tinsley*, 2016-0891, pp. 11-12 (La.App. 1 Cir. 1/18/17), 211 So.3d 405, 413. If the first prong of the test is not met and a change in circumstances materially affecting the child is not shown, the inquiry ends, and there is no basis for altering the custody decree. *Lunney v. Lunney*, 2011-1891, p. 4 (La.App. 1 Cir. 2/10/12), 91 So.3d 350, 353, *writ denied*, 2012-0610 (La. 4/4/12), 85 So.3d 130.

Because Kyle sought to modify a stipulated judgment, he bore the burden of proving a change in circumstances materially affecting the welfare of the child and that the proposed modification, i.e., that he be designated as the domiciliary parent subject to specific physical custodial periods in favor of Amber, would be in the best interest of the child. See *Tinsley*, 2016-0891 at pp. 11-12, 211 So.3d at 413; *Bonnecarrere v. Bonnecarrere*, 2009-1647, p. 6 (La.App. 1 Cir. 4/14/10), 37 So.3d 1038, 1044, *writ denied*, 2010-1639 (La. 8/11/10), 42 So.3d 381.

In this case, the trial court did not make an express finding that a change in circumstances materially affecting the welfare of the child had occurred. Rather, the trial court talked about its assessment of the Article 134 factors relevant to this case and then said that it was not going to change the domiciliary parent named in the 2011 judgment, but was going to "change the custody." The trial court then listed several changes it was making to the joint custody implementation order, including changing the physical custody allocation, ordering the parties to give L.L. medication as prescribed, and ordering the parties to continue providing counseling for L.L.

This court has previously held that when a trial court modifies a custody decree without determining whether there has been a change in circumstances materially affecting the welfare of the child, a legal error occurs, warranting a de novo review of the evidence. See *Estay v. Estay*, 2021-0329, p. 7 (La.App. 1 Cir. 4/27/22), 2022WL1237892, *4 (unpublished); *Cedotal v. Cedotal*, 2005-1524, p. 7 (La.App. 1 Cir. 11/4/05), 927 So.2d 433, 437; and *Bonnecarrere*, 2009-1647 at p. 7, 37 So.3d at 1044. However, since this court reviews judgments, not reasons for judgments, and considering the presumption of correctness of a trial court's determination, this court has held that where the record fails to demonstrate that the trial court actually applied an incorrect burden of proof, the manifest error/clearly wrong standard of review can be applied to ascertain whether there is support for an implicit factual finding that a change of circumstances materially affecting the welfare of the child occurred since the last stipulated judgment. *Estay*, 2021-0329 at pp. 8-9, 2022WL1237892 at *5.

We cannot determine from the transcript of the proceedings or the written judgment what legal standard the trial court applied in this matter. The trial court confirmed with the parties prior to beginning the hearing on October 15, 2021 that the previous custody decree was a stipulated judgment. However, there was no reference at the hearing to the applicable burden of proof for the proposed modification of the stipulated judgment aside from the trial court's discussion of the factors relevant to determining the best interest of the child. Nevertheless, since the record does not demonstrate that the trial court actually applied an incorrect burden of proof, we will apply the manifest error/clearly wrong standard of review to the implicit factual finding that a change of circumstances materially affecting the welfare of the child occurred. See *Estay*, 2021-0329 at p. 8, 2022WL1237892 at *5.

17

At the time the previous custody decree was entered in 2011, L.L. was only four years old and Kyle apparently lacked appropriate housing for L.L. to stay with him overnight. In the last few years, Kyle has remarried, and L.L. regularly spends time at his home. L.L.'s relationship with Amber has deteriorated significantly, and L.L. has had mental health struggles related in part to her relationship with her mother, which have resulted in anxiety and self-harming behavior. At the time Kyle filed the motion for modification of custody, L.L. was 14 years old and had expressed a strong preference to live with Kyle. The reasonable preference of a child to live with the other parent is not, of itself, a change in circumstances. *Harrel v. Harrel*, 52,248, p. 10 (La.App. 2 Cir. 6/27/18), 251 So.3d 546, 553. However, the deterioration of L.L.'s relationship with Amber, as well as Amber's apparent reluctance to recognize and seek help for L.L.'s mental health and academic struggles, which contributed to L.L.'s desire to live primarily with Kyle, have resulted in a change in circumstances materially affecting L.L.'s welfare. Based on our review of the record, we cannot say that the implicit factual finding that a change of circumstances materially affecting the welfare of the child occurred since the 2011 stipulated judgment was manifestly erroneous or clearly wrong.

Kyle argues on appeal that the trial court erred in failing to conclude that it would be in L.L.'s best interest to live primarily with him as the domiciliary parent. In making its determination regarding L.L.'s best interest, the trial court recognized L.L.'s clear preference to live with Kyle, but explained that the reasonable preference of the child is only one factor to be considered. The trial court also noted the length of time L.L. has lived with Amber as the domiciliary parent. The trial court did not believe that there was any abuse or that Amber's house is an unhealthy environment for L.L. The trial court noted L.L.'s history of academic struggles, but found that both parents were concerned about her grades

18

regardless of where L.L. lived. After weighing all of the relevant factors, the trial court concluded that it was in L.L.'s best interest for Amber to remain the domiciliary parent. Although we may have weighed the evidence differently, the trial court is in the best position to ascertain the best interest of the child given the unique circumstances of the particular case. After a thorough review of the entire record, we cannot say that the trial court abused its discretion in concluding that it is in L.L.'s best interest for Amber to remain the domiciliary parent.

## DECREE

For the reasons set forth herein, the July 6, 2022 amended judgment is affirmed. Costs of this appeal are assessed to appellant, Kyle Leger.

**AFFIRMED.**

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2022 CU 1113

AMBER LEGER

VERSUS

KYLE BRANDON LEGER

CHH

**HESTER, J. dissenting,**

I respectfully dissent from the majority's opinion. In this case, Kyle has proven a change in circumstances materially affecting the welfare of L.L. since the previous decree was entered and that his proposed modification is in L.L's best interest. See **Yepez v. Yepez**, 2021-0477 (La. App. 1st Cir. 12/22/21), 340 So.3d 36, 42.

While living primarily with her father for nearly a year prior to the conclusion of the trial, L.L. showed significant improvement in her school life, her home life, and her health and wellness. The evidence showed that these improvements are largely due to the changes in lifestyle that occurred when she was living with her father. L.L. started working with a tutor to improve her grades, restarted counseling to improve her anxiety and strengthen her familial relationships, and got back on track with her healthcare appointments. Additionally, L.L. expressed a strong preference to live with her father.

The primary consideration in any determination of child custody is the best interest of the child. The evidence presented by Kyle in this matter, particularly considering the relevant factors under La. Civ. Code art. 134(A), clearly showed that

it was in the best interest of L.L. to continue to reside primarily with Kyle. For these reasons, I find the trial court abused its discretion by failing to name Kyle as the domiciliary parent and by failing to implement a custody schedule whereby L.L. continues to reside primarily with Kyle. Therefore, I respectfully dissent.